UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


United States of America

v.                                                          Crim. No. 2:23–cr–9

Damien Peatman


**ORDER**

Damien Peatman is currently on pretrial conditions of release pending three felony charges for drug and firearm offenses.  After the United States Probation Office filed a September 6, 2023 Violation Report alleging that Mr. Peatman violated a condition of release by using cocaine, the government requested a hearing to address the alleged violation conduct and for Mr. Peatman to show cause why his conditions of release should not be revoked.  (Doc. 24.) Mr. Peatman denied that he violated conditions of pretrial release as specified in the Violation Report, and requested an evidentiary hearing.

The Court conducted evidentiary hearings on October 5 and October 11, 2023, during which it heard witness testimony and received documentary evidence.  (ECF Entries 39, 41; Hr'g Trs., Docs. 44, 45.)  After the close of evidence, both the government and Mr. Peatman submitted post-hearing memoranda.

As explained below, the Court finds by clear and convincing evidence that Mr. Peatman violated conditions of pretrial release as set forth in the September 6, 2023 Violation Report. The matter will be set for hearing to address whether conditions of release should be revoked.

**Procedural Background**

On January 26, 2023, the grand jury returned an Indictment charging Mr. Peatman with

the following crimes: (1) management and control of a residence in Eden, Vermont in November

and December 2022 for the purpose of manufacturing, storing, distributing, and using cocaine, in

violation of 21 U.S.C. § 856(a)(2); and possession of a pistol on December 1, 2022 as an

unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).  (Doc. 1.)  On

January 31, 2023, Mr. Peatman entered a plea of not guilty to the charges and was released on

conditions.  (ECF Entry 6, Doc. 9.)[1]  As relevant to the violation alleged in this matter, Condition

7(m) provided: "The defendant must not use or unlawfully possess a narcotic drug or other

controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical

practitioner."

The U.S. Probation Office filed several Violation Reports after Mr. Peatman's release on

conditions.  The following summary is derived from the Violation Reports.

I.      **March 31, 2023 Violation Report**

U.S. Probation Officer Alisha Waite filed a Violation Report alleging that Mr. Peatman

used cocaine on or about March 9, 2023.  The basis for the Violation Report was a urine sample

provided on March 9, 2023 that confirmed positive for cocaine.  Mr. Peatman denied use of

cocaine, but advised that he had been in the presence of friends who smoked cocaine.

Mr. Peatman completed a substance use assessment the next day at the Howard Center and was

recommended to participate in a recovery group.  On March 13, 2023, Mr. Peatman provided a

---

[1] By Superseding Indictment returned on January 18, 2024, the grand jury charged Mr. Peatman as
follows: (1) between summer 2022 and December 2022, use and maintenance of the Eden, Vermont residence to
manufacture, distribute, and use cocaine, cocaine base, and methamphetamine, in violation of 21 U.S.C. § 856(a)(1);
(2) possession with intent to distribute cocaine and methamphetamine on December 1, 2022; and (3) possession of a
pistol between November 2022 and December 1, 2022 as an unlawful user of a controlled substance, in violation of
18 U.S.C. § 922(g)(3).  (Doc. 62.)  Mr. Peatman has entered not guilty pleas to the charges.  The case is scheduled
for jury draw and trial on April 1, 2024.  (Docs. 60, 61.)

urine sample that tested negative.  The Probation Officer expressed concern about an "apparent lack of honesty," but did not request court action because Mr. Peatman was participating in a recovery group and had most recently tested negative for controlled substances.

## II.      June 29, 2023 Violation Report

Probation Officer Waite filed a Violation Report alleging that Mr. Peatman used cocaine on or about May 25 and May 30, 2023.  The bases for the alleged violations were urine samples provided on May 25 and May 30, 2023 that confirmed positive for the cocaine metabolite. Mr. Peatman denied use of cocaine, but explained that his girlfriend was using cocaine around the time of the relevant tests.  Mr. Peatman received a written reprimand from his Probation Officer for the positive tests.  On June 5, 2023, Mr. Peatman provided a urine sample that tested negative.  The Probation Officer again did not recommend court action, noting that Mr. Peatman appeared to be in the appropriate level of care to address substance use.  The Probation Officer further noted that Mr. Peatman's clinician would recommend intensive outpatient treatment (IOP) were he to test positive again.

## III.     July 27, 2023 Violation Report

Probation Officer Waite filed a Violation Report alleging that Mr. Peatman used cocaine on or about July 11, 2023.  The basis for the alleged violation was a urine sample provided on July 11, 2023 that confirmed positive for cocaine.  Mr. Peatman denied use of cocaine.  The Report noted that as a result of the positive test, Mr. Peatman's clinician increased his level of care to Intensive Outpatient Treatment (IOP), "the highest level of care available in the community."  Mr. Peatman began IOP on July 25, 2023.  The Violation Report requested that a hearing be held upon motion of the government.  The government did not request a hearing and no hearing was held.

IV.     **August 15, 2023 Violation Report**

Probation Officer Waite filed a Violation Report alleging that Mr. Peatman used cocaine on or about July 18, 2023.  The basis for the alleged violation was a urine sample provided on July 18, 2023 that confirmed positive for cocaine.  Mr. Peatman denied use of cocaine.  The Probation Officer noted that Mr. Peatman had begun IOP on July 25, 2023, but that he would not meet the criteria for inpatient treatment because he was denying use of cocaine.  The Probation Officer recommended that a show-cause hearing be held upon motion of the government.  The government did not file a motion for a show-cause hearing prior to the filing of the next Violation Report on September 6, 2023.

V.      **September 6, 2023 Violation Report**

Probation Officer Waite filed a fifth Violation Report alleging that Mr. Peatman used cocaine on an unspecified date in August 2023.  The basis for the alleged violation was a sweat patch worn by Mr. Peatman from August 14 to August 21, 2023,[2] which confirmed positive for the presence of cocaine and the cocaine metabolite.  According to the Violation Report, Mr. Peatman "adamantly denied using cocaine" when questioned about the sweat patch results.  The Report further noted that Mr. Peatman had provided urine samples on July 26, August 2, and August 11, 2023, all of which returned negative results.

On September 7, 2023, the government filed a motion requesting that a show-cause hearing be held.

**Analysis**

As relevant here, the Court must "enter an order of revocation and detention if, after a hearing, the judicial officer—(1) finds that there is . . . (B) clear and convincing evidence that the

---

[2] According to the Violation Report, as a result of continuing urinalyses that were testing positive for cocaine, Officer Waite placed Mr. Peatman on sweat patch monitoring on August 14, 2023.

4

person has violated any . . . condition of release; and (2) finds that—(A) based on the factors set

forth in section 3142(g) . . . , there is no condition or combination of conditions of release that

will assure that the person will not flee or pose a danger to the safety of any other person or the

community; or (B) the person is unlikely to abide by any condition or combination of conditions

of release." 18 U.S.C. § 3148(b)(1)(B), (b)(2)(A)–(B).  Although the statute does not prescribe

the type of hearing required under § 3148, in this Circuit defendants must receive "an

opportunity to testify and to present evidence on their own behalf." *United States v. Davis*,

845 F.2d 412, 415 (2d Cir. 1988).  In conducting revocation proceedings under § 3148, "the

district court should make specific findings of fact and should specify reasons for its revocation

and detention order." *Id.*

### Findings of Fact and Conclusions of Law

The Court received evidence in this matter on October 5 and October 11, 2023.

The government offered the following evidence: (1) testimony of U.S. Probation Officer Alisha Waite; (2) urinalysis reports for samples Mr. Peatman provided on March 9, 2023, May 25, 2023, May 30, 2023, July 11, 2023, and July 18, 2023 (*Gov't Exhibit 1*); (3) Affidavit of Dr. David J. Kuntz, Executive Director of Analytical Toxicology and Co-Laboratory Director for the Workplace Drug Testing Division of Clinical Reference Laboratory (CRL) (attaching reports for sweat patches worn by Mr. Peatman August 14 to August 21, 2023, August 21 to August 28, 2023, and August 28 to September 6, 2023) (*Gov't Exhibit 2*); (4) reports for sweat patches worn by Mr. Peatman September 6 to September 11, 2023 and September 11 to September 19, 2023 (*Gov't Exhibit 3*).

Mr. Peatman offered the following evidence: (1) testimony of Darcy Richardson, MS, a consulting forensic toxicologist; (2) testimony of Jordice Corey, MS, a nurse practitioner at Lamoille Health Partners; (3) testimony of Wiley Shipman, a psychotherapist/mental health counselor at Lamoille Health Partners; (4) Affidavit of Stacie A. Neumeyer, a Medical Records Custodian at Quest Diagnostics (attaching testing records for urine samples submitted by Mr. Peatman on August 16, September 8, September 11, September 14, September 16, September 18, September 20, September 25, September 28, and September 30, 2023) (*Deft Exhibit A*); Mr. Peatman's health records from Lamoille Health and additional testing records for urine samples provided by Mr. Peatman on October 2, October 5, and October 9, 2023 (*Deft Exhibit C*).

## I.  Precedent Addressing Efficacy and Reliability of Sweat Patches

This Court has previously considered the reliability and accuracy of sweat patches as a mechanism for detecting drug use by an individual under supervision.  *See United States v. Rachael Gauthier*, No. 2:19-cr-61, ECF No. 296 (*Gauthier*) (Aug. 22, 2022).  As in this case, in *Gauthier* the Court was presented with the Affidavit of Dr. Kuntz.  As there is no basis in the record to question the reliability of Dr. Kuntz's representations, the undersigned relies on Dr. Kuntz's Affidavit.  The Court restates the key findings in *Gauthier* with respect to reliability and accuracy of the sweat patch technology at issue in this case:

- "The Food and Drug Administration has approved the Pharm-Chem sweat patches used in this case for both safety and efficacy."  *Gauthier* at 2, ¶ 5.

- "The United States Probation Office adheres to a protocol that adequately ensures that sweat patches are properly applied and removed."  *Id*. ¶ 6.

- "CRL will not report a sweat patch test result as positive for cocaine unless both the parent drug and its metabolite, benzoylecgonine, are also present in quantities at or above the cut-off limits.  The presence of this metabolite supports a conclusion that the cocaine has been processed by the human body and is not the product of surface contamination.  Although environmental contamination may give rise to trace amounts of the cocaine metabolite, it will not provide a test result at or above CRL's cut-off limits."  *Id*. ¶ 7.

- "A sweat patch is a storage device that offers a much longer detection window than a urine test which reflects cocaine use in the approximately forty-eight hours preceding the test.  Because it is a storage device, it does not provide reliable information regarding individual dosages."  *Id*. at 7, ¶ 32.

- "A urine test result will capture cocaine use approximately two days prior to testing.  A sweat patch will reflect cocaine use prior to the wearing of the patch and during its use."  *Id*. ¶ 34.

## II.  Testimony of United States Probation Officer Alisha Waite

1.      Probation Officer Waite testified that the testing protocols employed by the U.S. Probation Office are approved by the Administrative Office of the U.S. Courts for use in monitoring clients' compliance with drug use conditions of supervision.  Officer Waite testified that the urine samples Mr. Peatman provided to the U.S. Probation Office on March 9, May 25, May 30, July 11, and July 18, 2023 tested positive for the cocaine metabolite on initial screening and after confirmation testing.[3]  Each of the urinalysis reports corresponding to the above

---

[3] Officer Waite acknowledged at the hearing that Mr. Peatman also provided negative UAs to Probation and that there were more negative UAs than positive UAs.  (Doc. 44 at 21:5–15.)  The negative Probation-administered urinalyses date to August 2, August 11, September 6, September 14, September 19, September 22, and October 5, 2023.

samples includes chain of custody certifications documenting the receipt of the sample from Mr. Peatman and transfer of each sample to the testing entity. The results of these urine tests are not disputed.[4]

2.      Officer Waite testified as to her understanding of the general nature of sweat patches. In her training and experience, cocaine metabolizes over approximately 48–72 hours. (Doc. 44 at 36:2–4.) A urine screen tests whether an individual has used cocaine over that timeframe prior to submission of the sample. (*Id.* at 36:5–8.) She testified that a sweat patch "is like a storage device . . . it collects the sweat for that application of the patch period, and it can capture 24 to 48 hours prior to the application of the patch; and UAs are more of a snapshot period of time where that sample is telling the lab what is in the sample at that brief period of time." (*Id.* at 49:9–14.) She explained that the "snapshot period of time" for cocaine is approximately 48 hours. (*Id.* at 50:4–16.)

3.      Officer Waite explained that generally a client will wear a sweat patch for a one-week period. She testified that Mr. Peatman requested to be placed on a sweat patch testing regimen because of his frustration that urine screens were returning positive despite his claimed non-use of controlled substances. (*Id.* at 30:17–25; *id.* at 31:1–8.) She further testified that it is not common for a defendant to request to be placed on sweat patch testing. (*Id.* at 30:20–22.) Officer Waite acknowledged that she has experience with defendants using controlled substances and engaging in conduct not exhibited by Mr. Peatman, such as missing tests, delaying tests, rescheduling tests, avoiding meetings with their Probation Officer, and reporting that the sweat patch has fallen off and cannot be tested. (*Id.* at 31:8–24.)

4.      Officer Waite was aware that Mr. Peatman arranged through his doctor's office to do separate urine testing between two and four times a week from the middle of August 2023 through the beginning of September 2023. (*Id.* at 32:2–11.) She acknowledged that such additional testing is not common among individuals she supervises. (*Id.* at 33:4–9.) Officer Waite agreed that Mr. Peatman continued to deny use even though an admission to use would likely have resulted in an increased level of treatment rather than revocation proceedings. (*Id.* at 33:23–25; *id.* at 34:1–25.)

5.      Mr. Peatman wore five sweat patches between August 14 and September 19, 2023; all returned positive for cocaine and the cocaine metabolite. (*Id.* at 23:7–24; *id.* at 26:9–14; *id.* at 27:7–13.) Based on her training and experience, Officer Waite stated that cocaine metabolite "is the result if the body processes the cocaine." (*Id.* at 26:15–17.)

6.      When Officer Waite spoke to Mr. Peatman about the positive sweat patches, he denied substance use and explained that he may have been exposed to cocaine while living at his mother's home. (*Id.* at 28:9–16.) As a result, Mr. Peatman moved out of his mother's home. (*Id.* at 28:13–16.)

---

[4] Although Mr. Peatman observes that these tests do not report "a particular level of the metabolite" (Doc. 48 at 3, ¶ 11), he does not dispute that the tests reported positive results.

7.      Officer Waite testified that certain of Mr. Peatman's Probation Office-administered urine tests returned negative results. The dates of these negative urine tests were July 26, August 2, August 11, September 6, September 14, September 19, and September 22, 2023. (*Id.* at 35:1–25.)

8.      Officer Waite expressed concern about Mr. Peatman's honesty regarding substance use. (*Id.* at 29:15–21.) She also stated that Mr. Peatman has never failed to report for testing or for meetings; that he has attended all treatment appointments; and that he has been compliant with outpatient treatment, including intensive outpatient treatment. (*Id.* at 30:5–16.)

9.      Officer Waite was aware that cocaine can metabolize outside a person's body, but she testified that "[t]he metabolite is from your body processing the cocaine." (*Id.* at 45:21–23; *id.* at 46:12–15.) She stated that she did not have a technical understanding of the metabolization process. (*Id.* at 46:16–17.)

## III.    Test Results for Sweat Patches Worn by Mr. Peatman Between August 14 and September 19, 2023

1.      The alleged violation in this case is based on a Pharm-Chem sweat patch worn by Mr. Peatman from August 14 to August 21, 2023. *Gov't Exhibit 2 (Specimen PB088010)*. The sweat patch was tested and reported positive for cocaine at the level of 233.1 ng/mL and the cocaine metabolite at the level of 30.6 ng/mL. *Id.*

2.      The record also contains the results of four additional Pharm-Chem sweat patches worn by Mr. Peatman. The first of these sweat patches was worn from August 21 to August 28, 2023. *Gov't Exhibit 2 (Specimen PB091345)*. The sweat patch was tested and reported positive for cocaine at the level of 234.6 ng/mL and the cocaine metabolite at the level of 28.9. *Id.* The second of these sweat patches was worn from August 28 to September 6, 2023. *Gov't Exhibit 2 (Specimen PB094313)*. The sweat patch was tested and reported positive for Amphetamine at the level of 12.0 ng/mL, cocaine at the level of 217.3 ng/mL, and the cocaine metabolite at the level of 54.1. *Id.* The third of these sweat patches was worn from September 6 to September 11, 2023. *Gov't Exhibit 3 (Specimen PB100868)*. The sweat patch was tested and reported positive for cocaine at the level of 127.6 and the cocaine metabolite at the level of 14.4. *Id.* The fourth of these sweat patches was worn from September 11 to September 19, 2023. *Gov't Exhibit 3 (Specimen PB099748)*. The sweat patch was tested and reported positive for cocaine at the level of 46.6. With respect to the cocaine metabolite, the laboratory report recorded "Present."[5]

## IV.    Expert Testimony of Darcy Richardson

1.      Darcy Richardson is a consulting forensic toxicologist with previous experience in toxicology as a State of Vermont employee. She holds a Master's Degree in forensic toxicology. She has been certified previously as an expert in forensic toxicology and has

---

[5] The CRL report notes that a cocaine/cocaine metabolite value between 2.0 and 9.9 ng/mL results in a reported status of "Present" in the laboratory report, whereas a cocaine/cocaine metabolite value at 10.0 ng/mL or above results in a reported status of "Positive."

testified on approximately 1200 to 1500 occasions.  Ms. Richardson testified in this case as an expert[6] "about both cocaine testing in the sweat patch and urinalysis and the process of cocaine metabolism."  (Doc. 44 at 54:1–3.)

2.      Ms. Richardson testified that cocaine can metabolize outside a person's body. She explained that cocaine can spontaneously hydrolyze into the cocaine metabolite *in vitro*. Ms. Richardson testified that this phenomenon is particularly relevant in sweat patch testing because "th[e] presence of a small amount of benzoylecgonine doesn't necessarily prove that it has been metabolized by the human body.  It could be spontaneously there."  (*Id.* at 55:1–14.)

3.      Ms. Richardson did not disagree that the presence of cocaine metabolite at or above the relevant cut-off level would be "more indicative of use" rather than environmental exposure, but she noted that "lower levels" resulting in a reported lab result of merely "Present" would not necessarily be indicative of cocaine use.  (*Id.* at 60:13–61:6.)

4.      When asked her opinion on a reported "positive" at a level of 14.4 or higher, Ms. Richardson stated that she "would expect it to be more coming out of the body."  (*Id.* at 61:7–9.)  When questioned about a cocaine metabolite level of 28.9, Ms. Richardson responded that she "would expect that to be more from use or certainly exposure to a very large quantity of cocaine."[7]  (*Id.* at 61:10–16.)

5.      Ms. Richardson agreed that a sweat patch with a reported result of 30.6 would be indicative of cocaine use or "ingest[ion] in some way."  (*Id.* at 62:12–16.)  Ms. Richardson also agreed that "the higher the number," the more likely she is to conclude that the person used cocaine.  (*Id.* at 62:17–19.)

6.      Ms. Richardson acknowledged that an individual could test negative by urinalysis for cocaine at the same time that a sweat patch covering the timeframe of the urinalysis returned a positive result.  Ms. Richardson testified on this issue as follows: "So when we get one that's positive and one that's negative, one of the possibilities is that, yes, there could be a smaller amount present that we're only seeing because we've collected a sample over a week versus a couple days and we found it kind of concentrated in sweat and get that.  Or it could be that we're seeing some sort of environmental contamination.  But that's why we want to look at more than one test in isolation."  (*Id.* at 68:22–69:4.)[8]

---

[6]  Ms. Richardson acknowledged that in 2018 Judge Reiss determined that she was not qualified to testify as an expert on sweat patches and urinalyses.  (Doc. 44 at 64:7–12.)  Ms. Richardson testified in this matter as an expert without objection.  (*Id.* at 54:1–5.)

[7]  The potential environmental exposure to "a very large quantity of cocaine" is not at issue in this case. Ms. Richardson explained the "unique" situations where a person might be exposed to cocaine quantities sufficient to result in a cocaine metabolite level around 28.9.  Such circumstances include "employees working with cocaine samples that they have done testing on," and "individuals prepping samples for drug-testing dogs and military surveillance."  (Doc. 44 at 61:15–25.)  No evidence was presented to demonstrate Mr. Peatman's exposure to a very large quantity of cocaine akin to the scenarios Ms. Richardson described.

[8]  With respect to the difference between "clinical" and "forensic" testing, Ms. Richardson agreed that forensic standards are "often" higher than clinical standards and that forensic standards employ "more rigorous testing."  (Doc. 44 at 63:6–20.)

7.      The reported metabolite level of the August 14 to August 21, 2023 sweat patch was 30.6 ng/mL.  According to CRL, such a level supports a conclusion that the cocaine has been processed by the human body and is not attributable to surface contamination.  Similarly, Ms. Richardson testified that a cocaine metabolite level of 14.4 or higher is likely indicative of cocaine metabolization within the human body.  She further explained that the more elevated the metabolite level, the more likely she would conclude a person used cocaine.  CRL and Ms. Richardson were consistent that the metabolite level corresponding to the August 14 to August 21, 2023 sweat patch supports a finding that cocaine was ingested.  This is compelling evidence of cocaine use by Mr. Peatman as alleged in the September 6, 2023 Violation Report.

8.      Ms. Richardson testified that declining cocaine metabolite levels over time could be indicative of cocaine "flushing" out of the body, rather than indicative of use of cocaine.  (*Id.* at 57:22–58:2; *id.* at 59:2–9.)  Thus, she opined that three consecutive sweat patches with corresponding cocaine metabolite levels of 54.1, 14.4, and simply "present" suggest flushing instead of use.  (*Id.* at 58:11–59:9.)  These cocaine metabolite levels presented to Ms. Richardson correspond to the test results for the sweat patches Mr. Peatman wore from August 28 to September 6, 2023; September 6 to September 11, 2023; and September 11 to September 19, 2023.  Even adopting the premise that these levels are indicative of flushing instead of use, the cocaine metabolite levels *increased* just before the three sweat patches with declining levels.  Specifically, the August 21 to August 28, 2023 sweat patch resulted in a cocaine metabolite level of 28.9 and the August 28 to September 6, 2023 sweat patch resulted in a cocaine metabolite level of 54.1.  The increased metabolite level is indicative of use.

9.      Therefore, based on the testimony of Probation Officer Waite and Ms. Richardson, and the Affidavit of Dr. Kuntz, the testing results of the sweat patch Mr. Peatman wore from August 14 to August 21, 2023 provide strong evidence that Mr. Peatman used cocaine, as alleged in the September 6, 2023 Violation Report.

## V.      Testimony of Wylie Shipman

1.      Wylie Shipman is a mental health counselor at Lamoille Health Partners in Morrisville, Vermont.  He has provided weekly therapeutic services to Mr. Peatman since February 16, 2023.  (Doc. 45 at 97:1–6, 21–23.)

2.      Mr. Shipman diagnosed Mr. Peatman with anxiety and depression.  (*Id.* at 97:11–14.)  According to Mr. Shipman, Mr. Peatman reported that notwithstanding his compliance with pretrial release conditions, he was testing positive for the presence of cocaine.  (*Id.* at 97:14–20.)  Mr. Shipman and Mr. Peatman discussed Mr. Peatman's mother's use of controlled substances in the home and together they determined that Mr. Peatman should move out of the residence because environmental contamination might be a factor contributing to Mr. Peatman's positive test results.  (*Id.* at 98:19–24.)

3.      Over the course of the treatment relationship, Mr. Shipman concluded that "the situation with his . . . drug testing was driving many of [Mr. Peatman's] symptoms of depression."  (*Id.* at 100:9–13.)  As a result, Mr. Shipman offered to assist Mr. Peatman to arrange "backup testing" through Lamoille Health Partners to "get another perspective on his

use." (*Id.* at 100:15–18.)  Mr. Shipman testified that none of his other clients submit to voluntary drug testing as frequently as Mr. Peatman does.  (*Id.* at 101:17–19.)  Mr. Shipman referred Mr. Peatman to Nurse Practitioner (NP) Jordice Corey at Lamoille Health Partners for urine drug testing.  (*Id.* at 79:2–4.)

## VI.    Testimony of Jordice Corey and the Lamoille Health Partners Urine Tests

1.      NP Corey is a family nurse practitioner at Lamoille Health Partners who provided primary care services to Mr. Peatman.  She provided mental health care and made necessary referrals for mental health services.  She agreed to provide the requested urine testing.  NP Corey testified that in her experience it was unusual for a person to request this kind of testing.  (*Id.* at 81:9–22.)

2.      NP Corey explained that the testing protocol involved medical staff observing the urine sample leaving Mr. Peatman's body, in-house testing of the sample, and confirmation testing conducted by Quest Labs.  (*Id.* at 82:6–25.)  NP Corey acknowledged that the urine testing reports stated that the testing was "for medical treatment only" and that the "[a]nalysis was performed as non-forensic testing."  (*Id.* at 85:4–8.)  NP Corey testified that this meant "chain of custody" protocols utilized in the forensic testing setting were not followed in this testing.  She further testified that there is no difference in the testing process itself between testing for forensic purposes and testing for a nonforensic purpose.  (*Id.* at 85:11–25.)  NP Corey explained that medical staff employ procedural safeguards to ensure the integrity of the testing/confirmation process, e.g., labeling of sample cups, packaging samples with bar-coded orders, and restricting access to samples prior to transport for confirmation testing.  (*Id.* at 87:12–18.)

3.      NP Corey testified that Mr. Peatman initially requested "random testing," but that he then requested testing every two to three days.  (*Id.* at 94:2–9.)  NP Corey stated: "[Mr. Peatman] set up the schedule for his testing."  (*Id.* at 94:14–17.)

4.      Mr. Peatman presented the results of the Lamoille Health urinalyses at the evidentiary hearing.  *See Deft. Exhibit A* (Affidavit of Stacie A. Neumeyer and attached test results).  The results are as follows:

| | |
|---|---|
| August 16, 2023 | Negative |
| September 8, 2023 | Negative |
| September 11, 2023 | Negative |
| September 14, 2023 | Negative |
| September 16, 2023 | Negative |
| September 18, 2023 | Negative |
| September 20, 2023 | Negative |
| September 25, 2023 | Negative |
| September 28, 2023 | Negative |
| September 30, 2023 | Negative |

5.      Mr. Peatman also presented additional results of the Lamoille Health urinalyses covering the October 2–October 9, 2023 period.  *See Deft. Exhibit C.*  The results are as follows:

| | |
|---|---|
| October 2, 2023 | Negative |
| October 5, 2023 | Negative |
| October 9, 2023 | Negative |

6.      The sweat patch and urine testing data in combination demonstrate the following. For the sweat patch worn from August 14 to August 21, 2023, there is one Probation negative urine test on August 11 and one Lamoille Health negative urine test dating to August 16, 2023. For the sweat patch worn from August 21 to August 28, 2023, there are no corresponding Lamoille Health urine test results.  For the sweat patch worn from August 28 to September 6, 2023, there was one Lamoille Health and one Probation negative test result on September 6.  For the sweat patch worn from September 6 to September 11, 2023, there are negative Lamoille Health urine tests on September 6, September 8 and September 11.  Finally, for the sweat patch worn from September 11 to September 19, 2023, there were negative urine tests on September 11, September 14, September 16, and September 18.

7.      In summary, the sweat patch worn from August 14 to August 21, 2023 tested positive for the cocaine metabolite at the level of 30.6, a result that defense expert Darcy Richardson agreed was indicative of cocaine use or ingestion.  The August 21 to August 28, 2023 sweat patch tested positive for the cocaine metabolite at the level of 28.9, and the sweat patch worn from August 28 to September 6, 2023 tested positive for the cocaine metabolite at the level of 54.1.  These test results are indicative of cocaine use.  The Lamoille Health urine testing data do not undermine this conclusion.  Ms. Richardson acknowledged that it is possible for a person to test positive by sweat patch and negative by urinalysis.  She stated that while environmental contamination might be one explanation, she also acknowledged that the apparent discrepancy might also be explained by the fact that the sweat patch collects a sample over a longer period than a urine test.  As Ms. Richardson explained, "there could be a smaller amount present that we're only seeing because we've collected a sample over a week versus a couple days and we found it kind of concentrated in sweat and get that." (Doc. 44 at 68:22–69:1.)  As a result, Ms. Richardson further explained, it is important to "look at more than one test in isolation." (*Id.* at 69:1–4.)  Applying that principle here, three consecutive sweat patches worn from August 14 to September 6, 2023 reported cocaine metabolite levels of 30.6, 28.9, and 54.1. All of these levels are indicative of use according to CRL, Officer Waite, and Ms. Richardson.

8.      The negative urinalyses conducted by Lamoille Health are not inconsistent with the conclusion that the metabolite levels for the August 14 to August 21, 2023 sweat patch indicate cocaine use.  Apart from the fact that these tests were not conducted to the forensic standards required for a proceeding to be initiated for violation conduct by an individual under federal supervision, there is only one negative urine test corresponding to the timeframe of that sweat patch—August 16, 2023.  As the evidence established, a urine test assesses the presence of cocaine over the approximately 48 hours prior to the test.  The August 16, 2023 urine test does not account for the remaining five days of the sweat patch testing period.  As Officer Waite observed at the evidentiary hearing, it is possible for a person to use cocaine after submitting a urine sample, resulting in a negative urine test but a positive sweat patch.  (*Id.* at 43:21–25.)

Specific to this case, it is not implausible for use to have occurred between August 16 and August 21, particularly given that Mr. Peatman was not subject to random testing at Lamoille Health, but rather he arranged his own urine testing schedule.  That the next two sweat patches contained cocaine metabolite levels of 28.9 and 54.1 supports the conclusion of continued use.  As the next urine test result from Lamoille Health dates to September 8, 2023, there are no Lamoille Health urinalysis results during the timeframe of the positive sweat patches worn from August 21 to September 6, 2023.[9]  These positive sweat patches followed five Probation-administered urinalyses that confirmed positive for cocaine.  The tests date to March, May, and July 2023.

9.      By contrast, the evidence of cocaine use is less clear regarding the sweat patch worn from September 11 to September 19, 2023.  The lab only reported a metabolite level of "Present," indicating a cocaine metabolite level between 2.0 and 9.9 ng/mL.  Moreover, Lamoille Health urinalyses were negative for samples submitted on September 11, September 14, September 16, and September 18, testing that would have covered almost the entire period of the sweat patch.[10]

10.      I find by clear and convincing evidence that Mr. Peatman violated pretrial conditions of release by using cocaine, as evidenced by the sweat patch worn from August 14 to August 21, 2023, which confirmed positive for the presence of cocaine and cocaine metabolite. In addition to the above conclusions, this finding is summarized as follows:

- Mr. Peatman's urine samples provided to the Probation Office on March 9, May 25, May 30, July 11, and July 18, 2023 confirmed positive for the cocaine metabolite.  Each of the urinalysis reports corresponding to the samples include chain of custody certifications documenting the receipt of the sample from Mr. Peatman and transfer of the sample to the testing facility.

- The U.S. Food and Drug Administration has approved the sweat patches used by the Probation Ofice in this matter.

- The Probation Office adheres to a protocol that adequately ensures that sweat patches are properly applied and removed.

- CRL will not report a sweat patch test result as positive for cocaine unless both the parent drug and its metabolite, benzoylecgonine, are also present in quantities at or above the cut-off limits.  The presence of this metabolite supports a conclusion that the cocaine has been processed by the human body and is not the product of surface contamination.  Although environmental contamination may give rise to trace amounts of the cocaine metabolite, it will not provide a test result at or above CRL's cut-off limits.

---

[9]  A September 6, 2023 Probation Office urine test that tested positive on initial screening did not confirm positive for cocaine.

[10]  This sweat patch was applied shortly after the formal initiation of revocation proceedings with the filing of the Motion to Show Cause on September 7, 2023.  (Doc. 24.)

- A sweat patch is a storage device that offers a much longer detection window than a urine test which reflects cocaine use in the approximately forty-eight hours preceding the test. Because it is a storage device, it does not provide reliable information regarding individual dosages.

- A urine test result will capture cocaine use approximately two days prior to testing. A sweat patch will reflect cocaine use prior to the wearing of the patch and during its use.

- Mr. Peatman wore five sweat patches between August 14 and September 19, 2023; all returned positive for cocaine and the cocaine metabolite.

- The sweat patch Mr. Peatman wore from August 14–August 21, 2023 tested positive for the cocaine metabolite at the level of 30.6 ng/mL. According to CRL and Probation Officer Waite, this metabolite level is consistent with use of cocaine, not environmental exposure. Defense expert Darcy Richardson did not disagree that the presence of cocaine metabolite at this level is indicative of use or ingestion rather than environmental exposure.

- The urine testing conducted by Lamoille Health Partners was performed as non-forensic testing, which means that while procedural safeguards were employed to ensure the integrity of the testing process, chain of custody protocols typical of forensic testing were not followed.

- Mr. Peatman arranged his own urine testing schedule with Lamoille Health Partners. He was not subjected to random testing.

- The Lamoille Health Partners urinalyses were negative for the presence of cocaine on August 16, September 8, September 11, September 14, September 16, September 18, September 20, September 25, September 28, September 30, October 2, October 5, and October 9, 2023. As to the August 14–August 21 sweat patch that is the subject of the September 6, 2023 Violation Report, there is one negative urine test administered by the Probation Office on August 11 and one Lamoille Health negative urine test on August 16, 2023. Therefore, the limited urine testing data covering the period of the August 14–21 sweat patch do not alter the scientifically-supported conclusion that cocaine use occurred during the timeframe of the sweat patch.

- The subsequent two consecutive sweat patches worn from August 21–September 6 also resulted in elevated cocaine metabolite levels of 28.9 and 54.1. These results are further reliable evidence of use of cocaine.

- Given that urine tests examine use in approximately the preceding forty-eight hours, and sweat patches report results over a much longer detection period, it is not inconsistent that Mr. Peatman tested positive for cocaine by sweat patch and negative by urine test on one occasion during the relevant period.

14

**Conclusion**

For the reasons explained above, I find by clear and convicing evidence that Mr. Peatman violated the conditions of his pretrial release by using cocaine, as evidenced by the sweat patch he wore from August 14 to August 21, 2023, which confirmed positive for the presence of cocaine and cocaine metabolite.

The Clerk of Court is requested to set this matter for a hearing to address whether, under 18 U.S.C. § 3142(g), "there is no condition or combination of conditions of release that will assure that [Mr. Peatman] will not flee or pose a danger to the safety of any other person or the community," or whether Mr. Peatman "is unlikely to abide by any condition or combination of conditions of release."  18 U.S.C. § 3148(b)(2)(A)–(B).

Dated at Burlington, in the District of Vermont, this 16th day of February 2024.

*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge

15